DECISION
{¶ 1} Relator, Robert J. Cassese, commenced this original action in mandamus seeking an order compelling respondent, Industrial Commission of Ohio ("commission"), to vacate its order re-setting the average weekly wage ("AWW") at $1,809.59 and to enter an order re-setting the AWW at an amount that includes profit sharing compensation received during the year 1998. Relator also requests that the writ order the commission to vacate that portion of its order denying him change of occupation compensation for the period of 100 weeks immediately following the initial 30-week period for which he was compensated pursuant to R.C. 4123.57(D).
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this case was referred to a magistrate of this court to conduct appropriate proceedings. The magistrate rendered a decision, including findings of fact and conclusions of law. In his decision, the magistrate noted that R.C. 4123.61
explicitly refers to AWW, not average weekly income. The magistrate determined that the term "income" is not synonymous with "earnings" or "wages." Therefore, the commission did not abuse its discretion when it refused to include profit sharing compensation relator received in 1998 in calculating his AWW.
 {¶ 3} The magistrate also found there was some evidence supporting the commission's determination that relator failed to meet the requirement in Ohio Adm. Code 4121-3-25(E) because relator failed to make reasonable attempts to secure employment to eliminate or reduce his wage loss. The magistrate specifically referenced relator's admission that he had not looked for a supervisor position in any other department at Ford that would have offered the overtime he enjoyed in his previous position. Therefore, the magistrate has recommended that we deny the requested writ of mandamus.
 {¶ 4} Relator asserts three objections to the magistrate's decision. First, relator argues that, contrary to the magistrate's finding, Ford, rather than relator, filed the one-page document captioned "salary information for Robert Cassese." Second, relator argues that the magistrate improperly placed the burden of proof on relator to establish that income he received pursuant to a profit sharing plan should be included in the calculation of his AWW. Lastly, relator argues the magistrate misconstrued Ohio Adm. Code 4121-3-25(E) in determining that the commission did not abuse its discretion when it denied relator a 100-week award for change of occupation under R.C. 4123.57(D). We find relator's arguments unpersuasive.
 {¶ 5} With respect to his first objection, relator correctly points out that, contrary to the magistrate's finding, the one-page document captioned "salary information for Robert Cassese" was submitted by Ford, not by relator. Nevertheless, this error is of no consequence. Regardless of who submitted the "salary information for Robert Cassese," the document was submitted along with relator's W-2 and was considered by the staff hearing officer. Furthermore, as discussed below in connection with relator's second objection, the submission of this document by Ford does not eliminate relator's burden to show that income relator received from his profit sharing plan constituted wages for purposes of calculating his AWW. Therefore, we sustain relator's first objection to the extent it seeks to modify the magistrate's findings of fact to reflect that the "salary information for Robert Cassese" was submitted by Ford, not relator. However, sustaining this objection does not entitle relator to relief in mandamus.
 {¶ 6} Relator argues in his second objection that the magistrate erred by failing to place the burden of proof on Ford to produce evidence excluding profit sharing monies from the standard wage calculation. We disagree. Ohio Adm. Code4123-3-09(C) expressly places the burden of proof on the claimant to establish each essential element of his claim. Therefore, relator had the burden to prove that compensation he received from his profit sharing plan constituted "wages" for purposes of calculating AWW. Because relator failed to submit any evidence reflecting the terms of this plan, we agree with the magistrate that the commission did not abuse its discretion in calculating his AWW without including this figure. Relator's second objection is overruled.
 {¶ 7} In his final objection, relator essentially contends that Ohio Adm. Code 4121-3-25(E) does not apply when a claimant has secured employment. Again, we disagree. We note that Ohio Adm. Code 4121-3-25(E) specifically contemplates situations where the employee continues his employment with the same employer. Nevertheless, Ohio Adm. Code 4121-3-25(E) imposes an additional requirement that a claimant at least attempt to mitigate the reduction in wages if he seeks an award for change of occupation in excess of the initial 30 weeks. Because relator seeks to be compensated under R.C. 4123.57(D) for the loss of overtime, he must show that he made "reasonable attempts" to secure other employment at Ford that would provide the overtime he previously worked. Relator's admission that he made no attempt to look for other supervisory positions at Ford consistent with his occupational limitations that would have offered overtime similar to his previous position, is some evidence supporting the commission's determination that relator did not make reasonable attempts to eliminate or reduce his wage loss. As the magistrate found, in the absence of such "reasonable attempts," relator failed to show under R.C. 4123.57(D) that the loss of wages resulted "directly and solely from the change of occupation." Therefore, we overrule relator's third objection.
 {¶ 8} Following an independent review of this matter, we find that the magistrate properly determined the pertinent facts, except that we modify the magistrate's factual findings to reflect that Ford, rather than relator, filed the one-page document captioned "salary information for Robert Cassese." We also find that the magistrate properly applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact (except as modified herein) and conclusions of law contained therein. In accordance with the magistrate's recommendation, we deny the requested writ of mandamus.
Objections sustained in part and overruled in part; and writof mandamus denied.
French and McGrath, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
The State of Ohio ex rel. : Robert J. Cassese, : :
Relator, : :
v. : No. 05AP-165 :
Ford Motor Company and : (REGULAR CALENDAR) Industrial Commission of Ohio, : :
Respondents. :
 MAGISTRATE'S DECISION Rendered on August 19, 2005 Margolius, Margolius Associates, and Paul W. Newendorp,
for relator.
Timothy J. Krantz, for respondent Ford Motor Company.
Jim Petro, Attorney General, and Gerald H. Waterman, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 9} In this original action, relator, Robert J. Cassese, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order resetting the average weekly wage ("AWW") at $1,809.59 and to enter an order resetting AWW at an amount that includes profit sharing compensation received during the year 1998. Relator also requests that the writ order the commission to vacate that portion of its order denying him R.C. 4123.57(D) change of occupation compensation for the period of 100 weeks immediately following the initial 30 week period for which he has been compensated.
Findings of Fact:
 {¶ 10} 1. Relator sustained an occupational disease while employed as a production supervisor in the foundry department of a plant operated by respondent Ford Motor Company ("Ford"), a self-insured employer under Ohio's workers' compensation laws. The industrial claim is allowed for "silicosis; mixed dust fibrosis," and is assigned claim number 98-632119. The commission officially recognizes December 23, 1998 as the date of diagnosis.
 {¶ 11} 2. On November 20, 2003, relator filed a "wage statement" on form C-94-A. The filing of the C-94-A prompted the scheduling of a hearing before a district hearing officer ("DHO") on February 20, 2004.
 {¶ 12} 3. On the hearing date, relator submitted a one page document captioned "Salary Info[rmation] for Robert Cassese." The document appears to be a computer printout of information retained by Ford. The printout reads as follows:
OBS * * * GROSS BASE OTDOL PROFIT
1997 * * * 99050.90 59850.00 34711.68 3149.03 1998 * * * 104520.24 62490.00 31608.68 8296.01 1999 * * * 74618.38 63240.00 0.00 11299.66
 {¶ 13} 4. Relator appeared only by counsel at the February 20, 2004 hearing. Following the hearing, the DHO issued an order stating:
It is the order of the District Hearing Officer that the C-94-A Wage Statement filed by Injured Worker on 11/20/2003 is granted to the extent of this order.
It is the order of the District Hearing Officer that the full weekly wage is set at $1809.59 and the average weekly wage is set at $1809.59 based on the following calculation: $94,098.68 divided by 52 weeks equals $1809.59.
* * *
This finding is based on the wage print-out information in file.
 {¶ 14} 5. Relator administratively appealed the DHO order of February 20, 2004.
 {¶ 15} 6. Following an April 1, 2004 hearing at which relator again appeared only by counsel, a staff hearing officer ("SHO") issued an order affirming the DHO order:
* * * [T]he C94-A, filed 11/20/2003, is granted to the extent of this order.
The full weekly wage is set at $1,809.59, based upon the wages from Ford Motor Company.
The average weekly wage is set at $1,809.59, based on the total wages of $94,098.68 divided by fifty-two weeks. This is based on the wages from Ford Motor Company.
* * *
Claimant contends the monies received by the Claimant in 1998, designated as profit sharing, should be included in the calculation of the average weekly wage.
The Claimant's contention is not found persuasive. The Hearing Officer finds that the profit sharing received by the Claimant in 1998 represents money determined by the overall profitability of the company. Claimant has submitted a lack of evidence that the monies designated as profit sharing are the result of the individual labor and services provided by this Claimant. The Claimant has not submitted any documentation regarding the profit sharing agreement nor was Claimant present to testify regarding this issue. Thus, the Hearing Officer declines to include any profit sharing in the average weekly wage calculation.
 {¶ 16} 7. On April 16, 2004, another SHO mailed an order refusing relator's administrative appeal from the SHO order of April 1, 2004.
 {¶ 17} 8. Earlier, on March 5, 2004, relator moved for change of occupation compensation under R.C. 4123.57(D). In support, relator submitted a report dated May 3, 1999, from Rana Hejal, M.D., and a report dated October 14, 2003, from Don Wolfson, M.D. Relator also submitted an affidavit and W-2 wage and tax statements from Ford for calendar years 2000 through 2003.
 {¶ 18} 9. The May 3, 1999 report of Dr. Hejal states:
I have seen Mr. Cassese at the Respiratory Diagnostic Center in January of 1999 for a second opinion regarding the etiology of his respiratory disorder. At the time of the evaluation, he was recovering from a thoracotomy for a resection of his right upper lobe. I have consulted Dr. Joseph Tomashefski, an Associate Professor of Pathology at Case Western Reserve University and Chairman of the Department of Pathology at MetroHealth Medical Center, who is a known lung pathologist, who confirmed the findings of abundant particulate material within the lung tissue, silicotic nodules, and simple mixed dust fibrosis. Also, the hilar lymph nodes submitted for examination had evidence of silicotic nodules. In his opinion, there were no structures compatible with asbestos bodies.
Given these findings and his known exposure to silica while at work, it is my opinion that any further exposure may potentially produce an irreversible fibrotic lung disease. Therefore, I would appreciate it tremendously if you would assist Mr. Cassese and I in attempting to prevent such a disorder by minimizing his exposure to silica dust.
 {¶ 19} 10. The October 14, 2003 report of Dr. Wolfson lists the following permanent restrictions: "Light physical labor, Limited period[s] of time, Clean environment."
 {¶ 20} 11. Relator's affidavit, executed January 30, 2004, states:
* * * Prior to the diagnosis of my occupational disease herein, I worked for the Ford Motor Company, as a production supervisor in the foundry department. My job involved" casting and cleaning" operations which exposed me to silica dust, causing my occupational disease herein.
* * * After my diagnosis, my physician recommended that I change jobs at Ford to one which minimized my exposure to silica dust.
* * * I returned to work at Ford on or about April 12, 1999. My job title remained production supervisor, however, I was assigned to the engineering department, which is an office environment far removed from the foundry area. The engineering department is a reasonably clean environment without significant silica dust.
* * * I have remained in the engineering department since April 12, 1999, although my job title has changed since then.
* * * As a production supervisor in the foundry, prior to my occupational disease, I was paid a salary but also had the opportunity to earn additional money by working longer hours and by increasing foundry production and output.
* * * Since my return to work in April, 1999, I am paid only my base salary, and I have lost wages due to being no longer able to supplement my salary in the same way as previously.
 {¶ 21} 12. Following a July 26, 2004 hearing, a DHO issued an order granting a 30 week change of occupation award and also granting a 100 week change of occupation award. In granting the latter, the DHO explained:
Ohio Administrative Code 4121-3-25-(E) provides "{a}n award for change of occupation in excess of the initial thirty weeks must be supported by evidence of reasonable attempts to secure employment."
At hearing the employer argued that the 100 week award was not compensable because the injured worker did not show that he attempted to find other employment to mitigate his loss of income. The employer's counsel argued that the injured worker did not meet his burden of proof in that he did not put forth evidence of a search for jobs which paid the same as his former position of employment.
At hearing, the employer's counsel argued that the injured worker had the duty to produce evidence of a good faith job search in an effort to mitigate the damages from the loss of income. Essentially, the employer contends that the injured worker did not obtain suitable re-employment, and the injured worker did not make a reasonable effort to mitigate the loss of income.
The Hearing Officer is not persuaded by the employer's argument.
Ohio Administrative Code 4212-3-25(E) goes on to state:
"Reasonable attempts" means such action taken to accomplish the purpose as may be customary, appropriate, rational and suitable to the circumstances and which would carry the purpose into effect but for the intervention of factors independent of the will of the party.
Since the injured worker did secure employment, the employer's defense turns to the argument that the injured worker's efforts to find re-employment were unreasonable. At hearing, the injured worker testified that in his new job he was the only non-degreed engineer in the engineering department. Further, as noted above, he was transferred or assigned to that new position by his employer. And, that he continued to successfully work in that position for over three years.
The Hearing Officer finds that the injured worker made a reasonable attempt to secure alternative employment. Clearly, his efforts seem appropriate, rational and suitable in that the employer had control over his employment and facilitated such a change. And, although he was the only non-degreed employee in the department, it appears that is [sic] was a custom of the employer to assist its injured employees in finding another job in the plant.
Neither the motion, nor the evidence adduced at hearing, provide exact figures of the precise lost wages in a cogent fashion. However, it is clear that prior to the change of occupation the injured worker earned about $95,000.00 (excluding profit sharing) and that after his change of occupation he earned about $78,000.00[.] The Hearing Officer finds that such economic loss was directly and solely due to the allowed occupational diseases that caused the injured worker to change his occupation.
 {¶ 22} 13. Ford administratively appealed the DHO order of July 26, 2004.
 {¶ 23} 14. Following an August 30, 2004 hearing, an SHO issued an order that vacates the DHO order. The SHO granted a 30 week change of occupation award but denied a 100 week award. In denying a 100 week award, the SHO explained:
Ohio Administrative Code Section 4121-3-25(E) requires that" an award for change of occupation in excess of the initial thirty weeks must be supported by evidence of reasonable attempts to secure employment."
The Hearing Officer finds the Claimant has not established that he made a reasonable attempt to secure employment to mitigate his loss of earnings from the foundry job.
Although the Claimant earned more at the foundry position ($95,000.00) versus the office position ($78,000.00), the Claimant earned considerable overtime pay in the foundry position.
Claimant has not established that he searched for other positions following the recommendation by his physician to leave the foundry environment.
Claimant testified at the District Hearing Officer hearing (transcript pages 33 and 34) that he did not investigate any other job possibilities after he was transferred to the office job on 4/12/99.
Claimant has provided no written evidence or testimony at the Staff Hearing Officer hearing that he has sought employment other than the lesser paying office position.
The Claimant has also failed to submit specific wage information to establish entitlement to the additional one-hundred weeks of Change of Occupation Benefits. Ohio Revised Code Section 4123.57(D) sets forth the provision for the additional one hundred weeks as follows:
". . . for a period of one hundred weeks immediately following the expiration of the period of thirty weeks, the employee shall receive sixty-six and two-thirds percent of the loss of wages resulting directly and solely from the change of occupation but not exceed a maximum of an amount equal to fifty percent of the statewide average weekly wage per week."
The claimant has failed to submit specific evidence of the exact wages lost due to his change of occupation to the office from the foundry. The claimant submitted W-2 statements revealing his yearly wages. Claimant's affidavit dated 1/30/2004 indicates he has "lost wages due to being no longer able to supplement my salary in the same way as previously." The Hearing Officer is unable to ascertain the specific loss of wages resulting directly and solely from the change of occupation.
Based on this testimony, the Hearing Officer finds the Claimant has not met his burden of proof to establish entitlement to the additional period of one-hundred weeks of Change of Occupation Benefits.
(Emphasis sic.)
 {¶ 24} 15. On September 25, 2005, another SHO mailed an order refusing relator's administrative appeal from the SHO order of August 30, 2005.
 {¶ 25} 16. On February 17, 2005, relator, Robert J. Cassese, filed this mandamus action.
Conclusions of Law:
 {¶ 26} Two issues are presented: (1) whether the commission abused its discretion in resetting AWW at $1,809.59, the calculation of which excluded profit sharing compensation received in the year 1998; and (2) whether the commission abused its discretion in denying a 100 week award for change of occupation.
 {¶ 27} The magistrate finds: (1) the commission did not abuse its discretion in resetting AWW at $1,809.59; and (2) the commission did not abuse its discretion in denying a 100 week award for change of occupation.
 {¶ 28} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
Turning to the first issue, R.C. 4123.61 states:
The average weekly wage of an injured employee at the time of the injury or at the time disability due to the occupational disease begins is the basis upon which to compute benefits.
 {¶ 29} Noting that R.C. 4123.61 explicitly refers to average weekly wage, not average weekly income, the court, in Stateex rel. McDulin v. Indus. Comm. (2000), 89 Ohio St.3d 390, 392, explained:
"Income" is not synonymous with "earnings" or "wages." Webster's Third New International Dictionary (1986) 714, defines" earnings" as "wages * * * earned as compensation for labor." Similarly, wages, constitute "monetary remuneration by an employer * * * for labor or services." Id. at 2568. "Income," on the other hand, represents" a gain or recurrent benefit that is [usually] measured in money and for a given period of time, derives from capital, labor, or a combination of both." Id. at 1143. Income is a much broader term than "earnings" or "wages," and cannot, therefore, be used interchangeably.
"[D]ividends, interest, and other forms of income unrelated to a claimant's job performance," cannot be included into the AWW calculation. Id.
 {¶ 30} Thus, use of the word "wage" in R.C. 4123.61
constitutes monetary remuneration by an employer for labor or services. State ex rel. Hord v. Combs, dba Combs Greenhouse,
Franklin App. No. 04AP-617, 2005-Ohio-1532.
 {¶ 31} Here, relator contends that the commission abused its discretion by failing to include so-called profit sharing compensation that relator received from Ford in 1998 as reflected in the printout submitted to the commission.
 {¶ 32} The commission, through its SHO, refused to include the profit sharing compensation. The commission explained:
* * * The Hearing Officer finds that the profit sharing received by the Claimant in 1998 represents money determined by the overall profitability of the company. Claimant has submitted a lack of evidence that the monies designated as profit sharing are the result of the individual labor and services provided by this Claimant. The Claimant has not submitted any documentation regarding the profit sharing agreement nor was Claimant present to testify regarding this issue. * * *
 {¶ 33} Here, in his brief, relator argues:
* * * Inclusion of profit sharing will not result in a windfall to Relator, because the profit sharing plan is an integral part of Relator's compensation package at Ford Motor Company. As shown by Ford's wage records * * *, Mr. Cassese received profit sharing monies in 1997, 1998 and 1999.
While the amounts varied in each of those years, the amount of profit sharing always formed a substantial part of his compensation. While he made less in profit sharing during the calendar year 1997, he made more during 1999. Consequently, the profit sharing monies are not an odd, one-time payment. Exclusion of this money from the AWW thus substantially understates Relator's usual income.
It should be noted that monies paid to Mr. Cassese pursuant to Ford's profit sharing plan are not based upon any equity ownership in the company, as would be the case under an employee stock ownership plan. These amounts are not reported as dividends or interest on [a] 1099 form, but are reported on his W2 to the IRS as ordinary income[.] * * * The IRS certainly taxes these monies as ordinary income, regardless of the designation that Ford places on Mr. Cassese's compensation. Whether designated as" base salary" "overtime", and/or "profit sharing", it is all taxed as ordinary income by the IRS.
The Staff Hearing Officer's stated rational[e] for excluding the profit sharing monies was a "lack of evidence that the monies designated as profit sharing are the result of the individual labor and services provided by this claimant". Instead, the Staff Hearing Officer found that these monies were determined" by the overall profitability of the company". The basis for such a distinction is found nowhere in the applicable statute, nor is there any common sense basis for such a distinction. Clearly, Mr. Cassese's work for Ford during the year 1998 did, in some measure, contribute to the overall profitability of Ford. The fact that it is based on collective efforts of all Ford employees, and not Mr. Cassese's individual labors, means nothing. * * *
(Relator's brief, at 7-8; emphasis sic.)
 {¶ 34} In his reply brief, relator argues:
In McDulin, the injured worker received a 1099 form from the employer reporting certain "miscellaneous income," which represented reimbursement of expenses for lodging, meals, tools and trucking expenses. McDulin sought inclusion of these amounts, in the calculation of his average weekly wage. The court declined to do so, noting the distinction between "wages" and "income," and holding that monies paid as reimbursement of expenses were not to be included in the average weekly wage calculation.
Relator does not claim that any and all amounts received from an employer represent "wages," includable in the average weekly wage calculation. However, the profit-sharing monies paid to Relator herein are clearly designated on Relator's W-2 as being "wages, tips, and other compensation." * * * They do not represent interest or dividends, in that they are not a return on any capitol investment of Relator's in the Ford Motor Company, nor are they reimbursement for expenses as in McDulin, Supra.
(Relator's reply brief.)
 {¶ 35} In the magistrate's view, relator's arguments here are premised in large part upon factual assumptions regarding the profit sharing agreement that are not supported by the record.
 {¶ 36} While it is conceivable that profit sharing compensation could, in some situations, be viewed as monetary remuneration by an employer for labor or services, the commission should not be required to speculate as to the relevant, specific terms of the profit sharing agreement at issue herein.
 {¶ 37} In its order, the commission appropriately noted that "[t]he Claimant has not submitted any documentation regarding the profit sharing agreement nor was Claimant present to testify regarding this issue."
 {¶ 38} Here, relator largely ignores the commission's stated basis for refusing to include profit sharing compensation into the AWW calculation and, instead, endeavors to add factual details regarding the profit sharing arrangement that are simply not included in the record. Assertions of counsel in the briefs submitted to this court do not constitute evidence that the commission was required to consider.
 {¶ 39} Relator submitted no information to the commission regarding the relevant terms of the profit sharing agreement. He was not available to testify at the two hearings held on this issue. Under those circumstances, it was indeed proper for the commission to conclude that relator simply failed to meet his burden with respect to the issue.
 {¶ 40} The second issue is whether the commission abused its discretion in denying a 100 week award for change of occupation.
 {¶ 41} R.C. 4123.57(D) states:
If * * * a change of such employee's occupation is medically advisable in order to decrease substantially further exposure to [injurious] dust * * * and if the employee, after the finding, has changed or shall change the employee's occupation to an occupation in which the exposure to [such] dust * * * is substantially decreased, the administrator shall allow to the employee an amount equal to fifty per cent of the statewide average weekly wage per week for a period of thirty weeks, commencing as of the date of the discontinuance or change, and for a period of one hundred weeks immediately following the expiration of the period of thirty weeks, the employee shall receive sixty-six and two-thirds per cent of the loss of wages resulting directly and solely from the change of occupation but not to exceed a maximum of an amount equal to fifty per cent of the statewide average weekly wage per week. * * *
 {¶ 42} Supplementing the statute, Ohio Adm. Code 4121-3-25
states:
(D) To qualify for an award, as described herein, the employee must establish by appropriate evidence that he has discontinued employment or has changed his occupation to one in which the exposure is substantially decreased. The fact that the employee continues his employment with the same employer will not preclude the granting of the award so long as his employment subsequent to the change is such that the exposure is substantially decreased and the change of occupation is certified by the claimant as permanent.
(E) An award for change of occupation in excess of the initial thirty weeks must be supported by evidence of reasonable attempts to secure employment. "Reasonable attempts" means such action taken to accomplish the purpose as may be customary, appropriate, rational and suitable to the circumstances and which would carry the purpose into effect but for the intervention of factors independent of the will of the party.
 {¶ 43} Parenthetically, it should be noted that in State exrel. Regal Ware, Inc. v. Indus. Comm., 105 Ohio St.3d 1,2004-Ohio-6893, the court deferred to the commission's expertise in upholding its analysis that a claimant was not required to provide evidence of a job search to receive the first 30 weeks of change of occupation benefits.
 {¶ 44} However, the commission's 30 week award is not at issue here. What is at issue is the commission's decision to deny a 100 week award because relator failed to search for employment that might eliminate the wage loss.
 {¶ 45} In his affidavit, relator explains that in April 1999, he was compelled by his occupational disease to transfer from his position as a production supervisor in the foundry department to a position in the engineering department which provided a reasonably clean environment free of the silica dust that had produced his occupational disease. In his affidavit, relator explains that in his new position in the engineering department, he was "no longer able to supplement my salary in the same way as previously." That is, in the engineering department, there was no overtime available to relator as was the case in the foundry department.
 {¶ 46} In the transcript of the July 26, 2004 hearing before the DHO (cited in the SHO order of August 30, 2004), relator indicates that he did not obtain another supervisory position when he transferred to the engineering department. Relator testified that his title is now "engineering blueprint coordinator."
 {¶ 47} During cross-examination, relator was questioned as to why he did not seek a supervisory position in another department at Ford. The following exchange occurred:
Q. Now, there are other plants that you could have been a supervisor in besides the casting plant, aren't there?
A. No.
Q. Why is that?
A. Because of limited breathing and — my breathing condition and excessive physical exertion involved with manning a line and running a line.
Q. Did you see if you could be a supervisor in engine plant two where it's clean?
A. The same is applying, as far as my breathing limitations.
Q. I understand that. But did you even check to see if you're being a supervisor in engine plant two would have allowed you to work within your restrictions?
A. No.
Q. Okay. All right. So you really haven't looked for any — you just kind of accepted where you are, and you haven't really looked to see if you could be a supervisor in any of the other departments because you assume that your restrictions won't allow you to be?
A. Yes, I would imagine, I guess.
In her August 30, 2004 order, the SHO explains:
The Hearing Officer finds the Claimant has not established that he made a reasonable attempt to secure employment to mitigate his loss of earnings from the foundry job.
Although the Claimant earned more at the foundry position ($95,000.00) versus the office position ($78,000.00), the Claimant earned considerable overtime pay in the foundry position.
Claimant has not established that he searched for other positions following the recommendation by his physician to leave the foundry environment.
Claimant testified at the District Hearing Officer hearing (transcript pages 33 and 34) that he did not investigate any other job possibilities after he was transferred to the office job on 4/12/99.
Challenging the SHO's determination, relator argues here:
* * * [P]rior to his industrial injury, he was employed in a production job where a substantial portion of his compensation consisted of overtime pay. Following his occupational disease, he moved to an office job in order to continue his employment at Ford. His office position does not afford the possibility of overtime, and he has suffered a loss of wages as a result. At the hearing, Mr. Cassese needed to prove no more than the foregoing facts in order to establish his entitlement to change of occupation benefits. Adding a further requirement, that he spend his evenings and weekends looking for another job when he is already working full-time, is patently absurd.
The job search requirement contained in the administrative rule cited above should be limited to situations where an injured worker is claiming change of occupation benefits, but is not working at all, or is only working marginally or part-time. In such cases, it is reasonable to require a job search to show that, in fact, the loss of wages is causally related to the injured workers' occupational disease, and is not a choice of the worker to work fewer hours. However, that reasoning in no way applies to the situation of Mr. Cassese.
Mr. Cassese has made a career for himself at Ford Motor Company. His loss of wages due to his change of occupation comes down to the difference between his prior position as production worker and his current position in the office. Essentially, his occupational disease resulted in him moving from a blue collar job to a white collar one. The difference in his wages is significant, the occupational disease forced the change of positions, and these circumstances are exactly what was contemplated by the statute providing for change of occupation benefits. In short, the DHO, in a well reasoned order had it exactly right. The SHO erred in reversing the DHO order.
Note that the administrative rule does not require a "job search;" it requires a reasonable attempt to secure employment." Relator acted reasonably in taking the position Ford offered him. If Relator had refused Ford's offer, and instead began a job search for other employment, Respondent Ford would have a strong basis to deny the subsequent 100 weeks of change of occupation benefits, namely, a refusal of suitable employment by Relator.
(Relator's brief, at 11-12; emphasis sic.)
 {¶ 48} In his reply brief, relator argues:
* * * Ford presented no evidence indicating that any other position was available to Relator which would have alleviated his loss of wages in his newly changed position. Nor did they present any evidence indicating that he had refused overtime, or would have been able to work it in his current position.
* * * Both Ford, and Respondent Industrial Commission, accuse Cassese of not exercising due diligence, and not acting in good faith in searching for alternative employment. Relator submits that, had he in fact refused the job that was offered to him by Ford, then he would be in fact acting in bad faith and not exercising due diligence in seeking alternative employment. If Cassese had he [sic] refused work, within his restrictions which Ford Motor Company made available, then he would not be entitled to change of occupation benefits. Respondents now turn this on its head, and accuse[s] Relator of a lack of good faith and due diligence for accepting a job Ford offered him.
(Relator's reply brief; emphasis sic.)
 {¶ 49} In the magistrate's view, relator's admission during his testimony that he had not looked to see if he could be a supervisor in any other department at Ford provides some evidence supporting the commission's determination that relator failed to meet Ohio Adm. Code 4121-3-25(E)'s requirement that he make "reasonable attempts" to secure employment to eliminate or reduce his wage loss. In the absence of such "reasonable attempts," relator has failed to show under R.C. 4123.57(D) that the loss of wages results "directly and solely from the change of occupation." That is, relator has failed to show a causal relationship between his loss of earnings and his occupational disease.
 {¶ 50} Relator's argument that the "reasonable attempts" requirement of Ohio Adm. Code 4121-3-25(E) should apply only when the claimant is not working at all or only working "marginally or part-time" is unpersuasive. Here, it is the loss of overtime upon which relator premises his claim to R.C. 4123.57(D) change of occupation benefits. Because relator seeks to be compensated under R.C. 4123.57(D) for the loss of overtime, he must show that he made "reasonable attempts" to secure employment at Ford that provides the overtime he previously worked.
 {¶ 51} Relator incorrectly suggests that the SHO denied a 100 week award because relator failed to seek employment with employers other than Ford. Relator asserts "[a]dding a further requirement, that he spend his evenings and weekends looking for another job when he is already working full-time, is patently absurd." (Relator's brief, at 11.)
 {¶ 52} In the magistrate's view, the SHO order of August 30, 2004 does not indicate that the SHO required relator to conduct a search for employment other than at Ford. The SHO's citation to the transcript of the DHO hearing indicates that it was relator's admitted failure to seek another supervisory position at Ford that was the basis for denial of the award.
 {¶ 53} Contrary to what relator seems to suggest, the issue before the commission was not whether relator acted reasonably in initially accepting a non-supervisory position in the engineering department. The issue was what relator failed to do after accepting Ford's offer in April 1999, to transfer to the engineering department.
 {¶ 54} The magistrate further notes that the SHO also denied a 100 week award for the reason that relator "has failed to submit specific wage information to establish entitlement." (Emphasis sic.) Relator's challenge to that commission's reason for denying 100 week award need not be addressed by this court here because the commission's first stated basis for denying the award is supported by some evidence and does not constitute an abuse of discretion.
 {¶ 55} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.